THE JOYCE-WATKINS COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(TOM MINLEY, Defendant in Error.)

*Opinion filed April 20, 1927.*

1. JURISDICTION—*jurisdiction of Illinois extends to "low-water mark" of Ohio river.* Under the constitution of 1870, fixing the boundary line of the State along the Ohio river on its northwestern shore, and by the Virginia cession of the Northwest Territory fixing the low-water mark on the north or northwest side of the river as the boundary of Virginia, which later became the State of Kentucky, the jurisdiction of Illinois must be held to extend to the "low-water mark" on the north or northwestern side of the river.

2. WATERS—*what is meant by the "low-water mark" of a river.* The "low-water mark" of a river is the point to which the water has receded at its lowest stage.

3. SAME—*when change in course of a river affects boundary of State.* Where a river is declared to be the boundary between States, the river as it runs continues to be that boundary although it may have changed its course from natural causes by imperceptible wear, but if it suddenly changes its course or deserts its original channel the boundary remains in the middle of the deserted river bed.

4. WORKMEN'S COMPENSATION—*jurisdiction of State is determined by lowest water mark of Ohio river.* In the absence of a showing of sudden or perceptible changes in the course of the river the low-water mark of the Ohio river is the extent of the State's jurisdiction, and in compensation cases is to be determined by the evidence as to the point to which the waters of the river have receded at its lowest stage.

5. SAME—*burden is on the claimant to establish jurisdiction.* Where the question is raised, the burden is upon the claimant for compensation to establish that he was within the jurisdiction of the State at the time of the alleged injury.

6. SAME—*what is competent evidence of low-water mark of river.* Where the question is raised that an employee at the time of his alleged injury was outside the jurisdiction of the State, which extends to the low-water mark of the Ohio river, the low-water mark may be shown by the testimony of experienced rivermen to be beyond the point where the employee was working, in accordance with their recollection of various stages of the river; but such witnesses should not be permitted to testify that they un-

derstood or heard that the structure upon which the employee was working was built out to meet the low-water mark, as such testimony is hearsay.

7. SAME—*when finding that disability is due to injury is supported by evidence.* Although the medical testimony is conflicting, a finding that the employee's disability is due to an injury received in the course of his employment cannot be said to be contrary to the manifest weight of the evidence where it is undisputed that prior to the alleged injury the claimant was an able-bodied man doing heavy work, that he has been unable to work since the injury, and where the evidence tends to show that the disability is permanent and that it is not due to prior injury or disease.

8. SAME—*court cannot set aside reasonable finding of Industrial Commission on evidentiary facts.* It is the province of the Industrial Commission to draw reasonable conclusions and inferences from evidentiary facts, and courts are not privileged to set aside its finding or award unless manifestly against the weight of the evidence.

WRIT OF ERROR to the Circuit Court of Massac county; the Hon. A. E. SOMERS, Judge, presiding.

WILLIAM GREENE, and H. L. HOWARD, for plaintiff in error.

GEORGE R. STONE, (AUGUST L. FOWLER, of counsel,) for defendant in error.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

Plaintiff in error is engaged in the business of creosoting and shipping railroad ties. Its plant is on the Ohio river, near Metropolis. The ties are brought to a place on the shore of the river by river barges. A double-track railway extends from the plant to this point. On the river bank it is laid on an inclined structure extending from the bank to a point about 260 feet into the river as the water in the river stood on March 24, 1924. Defendant in error, Tom Minley, was on that date employed by plaintiff in error in transferring ties from the barges to cars standing on

the incline. There were sixteen cars on this incline at the time, eight on each track. Fourteen of them were over the water. Minley was working at a point over the water about the length of a railway tie from the water's edge. His evidence shows that while transferring one of these ties, weighing about 200 pounds, it "failed to catch on the cross-beam;" that he was required to hold it up with his head until one of the other employees came and relieved him; that while holding the tie on his head something seemed to "pop" in his neck and back and from that time on he experienced great pain; that he endeavored to work for a day or two thereafter but was compelled to quit and has not been able to work since that time. He was paid compensation and received medical services from the company's physician until June 16, 1924. On August 5, 1924, he filed his claim for compensation before an arbitrator. The arbitrator's record shows that it was agreed that the relation of employer and employee existed between the parties hereto but that they were unable to agree that they were working under and subject to the Workmen's Compensation act. The arbitrator, after complete hearing of evidence, awarded compensation in the sum of $11.54 per week for a period of 368 weeks and $3.28 for one week, and a pension for life at the rate of $30 per month for the reason that the injuries sustained had caused complete disability, rendering the employee wholly and permanently incapable of work. The sum of $114 was shown to have been paid. Plaintiff in error filed its petition for review before the commission, and on January 15, 1925, a hearing was had before that body. Testimony was then offered on behalf of defendant in error that his condition had not improved. The commission confirmed the award of the arbitrator. On review the circuit court of Massac county confirmed the award with the exception of the pension, which it reduced from $30 per month to $28.33⅓ per month. The case is here by writ of error for further review.

Two points are raised and argued here on the errors assigned by plaintiff in error: First, whether the Industrial Commission had jurisdiction of this cause; and second, whether Minley's disability resulted from injuries sustained by him as claimed.

Concerning the first assignment of error, it is argued that the injury to Minley having taken place beyond the water's edge of the Ohio river it occurred without the jurisdiction of the State of Illinois. The evidence showed, as we have seen, that the injury occurred while Minley was working on the incline over the water at a point approximately eight or ten feet beyond the water's edge. The structure upon which the track of plaintiff in error was laid extended into the river about 250 feet beyond where he was working. Article 1 of the constitution of 1870 fixes the boundary line of Illinois along the Ohio river on its northwestern shore. When Virginia ceded to the United States the Northwest Territory, in the year 1784, she retained the title to the bed of the Ohio river to the low-water mark on its north or northwest side. When Kentucky became a State she succeeded to the rights of Virginia. *Wedding* v. *Meyler*, 24 Sup. Ct. 323; *Indiana* v. *Kentucky*, 10 id. 1051.

Plaintiff in error concedes that the jurisdiction of Kentucky extends only to the low-water mark on the northwestern side of the river, but urges that there is no competent evidence showing that Minley, at the time he was injured, was north or northwest of the low-water mark. "Low-water mark" is generally accepted by the authorities to mean the point to which the water receded at its lowest stage. *City of Peoria* v. *Central Nat. Bank*, 224 Ill. 43; *Plumb* v. *McGannon*, 32 Q. B. (Can.) 8; Farnham on Water and Water Rights, sec. 417.

Plaintiff in error contends that the low-water mark which marks the boundary between Kentucky and Illinois is the low-water mark as it was established when Virginia

ceded the Northwest Territory and in 1818 when Illinois became a State, and that there is no evidence in the record to show what that low-water mark is. We would not be justified in this proceeding, where the State of Illinois is not represented, to determine the boundary line between this State and the State of Kentucky. That question is of far too great importance to be heard without the appearance of the State. It is sufficient in this proceeding to determine whether or not the commission and the circuit court were justified in holding that Minley was within the jurisdiction of Illinois. It becomes necessary, in order to determine that question, to pass on the contention of plaintiff in error that the low-water mark marking the boundary between Illinois and Kentucky must be considered the low-water mark as of 1818.

It is conceded by counsel for both parties to this proceeding that no commission has ever determined the exact boundary line between Illinois and Kentucky. This court will take judicial notice of the fact that the waters of the Ohio river vary in their stages. No authorities have been cited, and we know of none, holding that in determining the boundary line between two jurisdictions, when that boundary line is designated as the shore line or the low-water mark of a river, such boundary must be considered as a definitely fixed line, in the absence of a determination thereof by a duly authorized commission or other means of fixing the same. It has been held in cases in which disputes as to the boundary line between Illinois and Iowa and Illinois and Missouri have arisen, that the location of the middle thread of the Mississippi, conceded to be the boundary line, is to be determined by the main channel of the river and not by that part which flows in seasons of high water and is dry at other times; that where the change of the main channel is imperceptible at any given time the boundary line follows the middle thread of the stream as changed. The rule is, that when a stream dividing co-

terminus States alters its channel by a gradual or imperceptible process of wear or alluvion the boundary shifts with the stream. Where a river is declared to be the boundary between States the river as it runs continues to be that boundary although it may have changed its course from natural causes by imperceptible wear, but if it suddenly changes its course or deserts its original channel the boundary remains in the middle of the deserted river bed. (*Bellefontaine Co.* v. *Niedringhaus,* 181 Ill. 426; *Keokuk and Hamilton Bridge Co.* v. *People,* 176 id. 267; *Same* v. *People,* 167 id. 15; *Same* v. *People,* 145 id. 596; *Buttenuth* v. *St. Louis Bridge Co.* 123 id. 535; *Handly's Lessee* v. *Anthony,* 5 Wheat. 374.) Considering the analogy of such a boundary line to one designated as "low-water mark," constituting the boundary between Illinois and Kentucky, we are of the opinion that in the absence of a showing of sudden or perceptible changes in the course of the river the low-water mark of the Ohio river as referred to in the designation of the boundary between Illinois and Kentucky is to be determined by the evidence as to the point to which the waters of that river have receded at its lowest stage. *City of Peoria* v. *Central Nat. Bank, supra.*

It is necessary in this case, however, to determine only whether the low-water mark on the Ohio river at the point where Minley was injured was north or south of that point. Plaintiff in error argues that the burden is upon Minley to establish that he was within the jurisdiction of Illinois, and this is true. The record contains the testimony of Minley, who stated that he had worked on this incline track for fifteen years; that he had been acquainted during that time with the low-water mark with reference to the end of the incline track, and that it was south of the end of the track and about 250 feet beyond where he was injured; that he had seen a barge unloading at the water's edge near the lower end of the incline track and that the water's edge was at that time south of the end of the track. He also

testified that the water was higher in March than in July and August. John Lawrence also testified that for a period of nine years he had been acquainted with the incline upon which plaintiff in error's tracks were laid; that he had observed the various stages of the water of the Ohio river during that time; that the river occupied different levels; that he had seen the water's edge down at the end of the incline. These witnesses both testified that they understood or heard that the incline was built out to meet the low-water mark. This testimony was not competent as it was hearsay, but it was competent to consider the testimony of experienced rivermen as to their recollection of various stages of the river. (*Keokuk and Hamilton Bridge Co.* v. *People,* 167 Ill. 15; *City of Peoria* v. *Central Nat. Bank, supra.*) Without attempting to determine what is, in fact, the boundary line between Kentucky and Illinois, it is evident from the testimony of these witnesses that Minley, when he was injured at a point a tie's length from the water's edge and approximately 250 feet from the south end of the incline, was north of the low-water mark, and it is sufficient for the purpose of this hearing to determine only that feature of the question. Plaintiff in error's contention therefore cannot be sustained.

It is also objected that the parties hereto were not operating under the Workmen's Compensation act. It is not said that plaintiff in error in the operation of its creosoting plant was not under the act, but that there is no showing that it had elected to come under the act or that the provisions of the act applied to it automatically without election, and that it was incumbent on Minley to make such proof. Minley testified that plaintiff in error probably employs 75 to 100 men in its creosoting plant and in handling ties. Dr. Wallbright testified on the hearing that he was physician for the company; that he reported regularly to the company on the progress of cases in which compensation was paid; that he treated Minley until the 16th of

June, and that compensation was paid to Minley so long as the witness was treating him. While it cannot be said that payment of compensation under misapprehension of the rights of the employer will work an estoppel against a defense to a claim therefor, such payments in this case can scarcely be said to be under misapprehension as plaintiff in error then knew whether it was operating under the Compensation act, and this fact, with the character of the business shown, affords proof that it is operating under the act. The evidence of Dr. Wallbright also indicates that it was so operating, and the commission was justified in so finding. This being so, Minley was also under the act. *Illinois Publishing Co.* v. *Industrial Com.* 299 Ill. 189.

The next contention is, that the finding of the commission that disability of defendant in error is due to his injuries is contrary to the manifest weight of the evidence. Dr. Willis testified for defendant in error that he examined him on March 28,—eight days after the injury; that he found a swelling in his neck and shoulders; that he examined his heart and found it enlarged to one-fifth more than its normal size and found a weak spot in his lungs. He testified that prior to that time he did not know of the condition of Minley's heart and lungs. He gave it as his opinion that the enlargement of the heart and condition of the lungs was due to trauma arising from the injury. He stated that Minley was not able to work and never would be. He stated, also, that he could not tell whether or not the enlarged condition of the heart which he found on March 28 could develop within eight days after the accident, but that the strain of the injury would aggravate an enlargement of the heart and weakness of the lungs. Dr. Wallbright testified that he treated Minley as the company's physician until June 16, 1924, and thereafter as his physician without pay; that he did not think Minley could work or would ever be able to work; that he found no enlargement of the heart but did find an enlarged aorta; that he

took an X-ray picture, which showed negative as to the spine. The witness testified that in his opinion Minley's inability to work was not due to an accident but to other causes. He testified that the injury received could not cause an enlarged aorta or weak lungs; that after June 16 he treated him for gumma of the spinal cord and for specific trouble which he testified was of years' standing; that he subjected him to the Wasserman test and found that it showed four plus, indicating specific trouble of some years' standing. Dr. Tucker qualified as an X-ray expert and testified that he took X-ray pictures of Minley on April 12, 1924, and that the plates showed negative.

The medical testimony, as is not unusually the case, does not agree. It is, however, undisputed that defendant in error is, and has been since the time of the injury, unable to work, and all the evidence tends to indicate that his disability is permanent. It is further undisputed that Minley prior to the injury was apparently an able-bodied man. He was forty-two years of age. He engaged without difficulty in the handling of railway ties weighing as much as 200 pounds and had been engaged in that or similar occupation for fifteen years. His evidence shows that he had no injury prior to the one complained of, and no spinal or heart trouble. He further testifies that at the time of the claimed injury he felt a severe pain and was unable to straighten up. He was treated by the plaintiff in error's doctor as an injury case and was paid compensation for approximately three months. We cannot, therefore, say that the finding of the commission was manifestly against the weight of the evidence. The rule has been established by many decisions of this court that it is the province of the Industrial Commission to draw reasonable conclusions and inferences from evidentiary facts, and courts are not privileged to set aside its finding or award unless manifestly against the weight of the evidence. *Armour Grain Co.* v. *Industrial Com.* 323 Ill. 80; *Mehay* v. *Indus-*

*trial Com.* 316 id. 97; *Great Lakes Supply Co.* v. *Industrial Com.* 309 id. 68; *Imperial Brass Manf. Co.* v. *Industrial Com.* 306 id. 11; *Keller* v. *Industrial Com.* 302 id. 610.

We are of the opinion, therefore, that the judgment of the circuit court should be affirmed.   *Judgment affirmed.*